UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA                                    05-CR-100073-NG

vs

MARK MATTHEWS

## MOTION TO SUPPRESS

Now comes the defendant, Mark Matthews, and moves to suppress the following:

1. Any and all items, including a Remington, model 870, 16 gauge pump action shotgun, Serial No. 68750W that was seized from the premises at 32 Bellevue on December 4, 2004.
2. Any and all items seized from a truck bearing Texas Registration 6GGF73, that was parked on Marshall Street, Haverhill, Massachusetts, on December 4, 2005.
3. Any and all statements made by Mark Matthews at the Haverhill Police Station on December 4, 2004.

The defendant submits that the above listed items were seized during a warrantless search of the said premises and truck. The defendant's statements were the fruit of the said searches, made after the defendant was arrested without a warrant or probable cause, were the product of coercion and not freely made. All in violation of the Fourth Amendment to the Constitution of the United States.

The defendant relies upon the memorandum filed herewith in support of this motion.

## REQUEST FOR ORAL ARGUMENT

It is respectfully requested that the Court hear oral argument on this motion and submits that oral argument will assist the Court in deciding this motion.

Respectfully submitted
Mark Matthews
By his attorney,

/s/ Paul F. Markham
Paul F. Markham
PO Box 1101
Melrose, MA 02176
781-665-1800
B.B.O. 320820

<u>AFFIDAVIT</u>

  I, Kristle Matthews, make this affidavit in support of the Motion To Suppress filed by the defendant, Mark Matthews, in United States v. Matthews, CR 05-10073-NG. I am the daughter of the defendant and currently reside at 2 Lawrence Street, Methuen, Massachusetts. I previously resided in an apartment on the first floor of 32 Belleview Avenue, Haverhill, Massachusetts with Joanne Forbes, the lessee of said apartment. On November 4, 2004 my father, Mark Matthews, with the consent of the said Joanne Forbes and at my invitation, came to visit me and my daughter at our apartment and lived in said apartment through December 4, 2004. He had driven from Texas in a truck that he parked on Marshal Street and was visible from the kitchen window of the apartment.

  On the morning of December 4, 2005, I took the trash out to the back yard area of the apartment and I was approached by two police officers. They questioned about my father. During the questioning, I told them that my baby daughter was in the apartment and that I was in the middle of feeding her. I then went inside the apartment, got my daughter and came back outside. At no time during the questioning did I say that I had observed a gun in my apartment. The police told me they needed to question me further at the police station. I went back into the apartment to get a pair of shoes to wear and came back outside.

  I was then taken to the police station by a female officer, who left immediately after taking me into the station. I was first taken to a large, empty room where I waited for approximately 10 minutes and then brought to a smaller room in the station. A different policeman came into that room and told me he wanted to ask me questions about my father. After he questioned me he took me to another room where I remained alone and was told I was to "await the investigation". I left the station with my daughter because she needed a diaper change. I was walking away from the station when I was apprehended by the Haverhill police, placed in police in a police car and taken back to the station where I was further interrogated and was told by the police that they had found a weapon in my apartment. I was asked if there were any more weapons in the apartment. I responded, "I have no idea".

  After the police told me they had found a weapon in my apartment, I was asked to sign a consent form for the search of my apartment. While I was in the process of signing the form, one of the police officers took it from me and said it was no good and I would

have to sign another one when we got to the apartment.  We then left the police station and, arrived at my apartment in approximately 5 minutes

     At my apartment I saw a crowd of people, including police and news reporters.  I entered the apartment where I saw four police officers already inside the apartment.  The kitchen cabinets were open, the mattress was pulled off the bed in my bed room, the baby's mattress was pulled of her crib, and the drawers to the dressers were open and messed up.  I observed a gun, which I had never seen before, sticking out from under the bed in the baby's room.  I also observed that my father's bag was open and his papers were strewn all over the room.  I later noticed that my father's social security card and picture identification were missing from the bureau.  All the furniture in the living room had been pulled away from the wall and tipped over.

     After I had observed the condition of the apartment I was presented with a second consent to search form which I signed while sitting at my kitchen table.

                                              _____
                                              Krystle Matthews

Subscribed and sworn to under the pains and penalties of perjury before me this 27th day of May 2005.

                                              _____
                                            Paul F. Markham, Notary Public
                                            My commission expires
                                            August 4, 2011

<u>AFFIDAVIT</u>

I, Mark Matthews, make this affidavit in support of my Motion To Suppress, filed in Cr. No. 05-16073- NG, presently pending in this Court. On or about November 1, 2004 I drove a truck that was loaned to me by a friend, Jim Jackson of Spicewood, Texas, from Texas to Haverhill, Massachusetts to visit my daughter, Kristle Matthews, and granddaughter who were then residing at an apartment at 2 Bellevue Avenue. I arrived in Haverhill on or about November 4, 2004, and, at my daughter's invitation and with the consent of Joanne Forbes, the lessee of the premises, stayed with my daughter in her apartment. I slept on a bed in my granddaughter's room and kept my personal belongings in that room.

On December 4, 2004, from the kitchen window of the apartment, I observed two police officers in the immediate vicinity of the truck. One of them was attempting to open the door of the truck. My daughter went outside to empty the trash and, later that morning, when I was alone in the apartment, the telephone rang but I did not answer it because it was not my home and I did not think the call was for me. I then heard a voice on a bull horn outside the apartment, instructing me to answer the telephone. I answered the telephone and was instructed to leave the apartment building by way of the front door. I left the building with my arms raised and, once out of the building, I was apprehended by several police officers, placed in a prone position on the ground and handcuffed. There were approximately 8 or more police officers in the immediate vicinity.

I was then brought to the police station. At the station I was asked if I was Mark Matthews and I said that I was. I was later booked and fingerprinted. During the booking process I was told by the police that they had found a weapon in the apartment and asked me if there were any more weapons in the apartment. I did not admit to ownership of the

gun and said I had no idea if there were any other weapons in the apartment. I was not interrogated further at this time but I was later brought into another room, advised of my rights for the first time, and asked questions. This interview was recorded. The interviewer told me that they had my daughter and that I should tell them about gun that was found in her apartment and not let my daughter "go down" for having a gun in her apartment. I understood this to mean that they were going to charge my daughter with some offense relating to the gun. Because I was concerned for my daughter, I told them she had nothing to do with the gun and to keep her out of it. I then admitted that the gun they said they had found was mine. I made this admission only because the interviewer threatened that my daughter would be charged with possession of the gun and because the gun had already been found in the apartment.

                                                         _____
                                                         Mark Mathews

Subscribed and sworn to under the pains and penalties of perjury before me this 27th day of May 2005.

                                          _____
                                          Paul F. Markham, Notary Public
                                          My commission expires
                                          August 4, 2011

(UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA                                    05-CR-10073-NG

    vs

MARK MATTHEWS

MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

FACTS

In early November 2004 the defendant drove from Texas to Haverhill, Massachusetts, in a truck to he borrowed from a friend of his, Jim Jackson of Spicewood, Texas.  He came to Massachusetts to visit his daughter, Kristle Matthews (hereinafter "Krystle"), and his granddaughter.  Krystle and her baby daughter were living in the first floor apartment at 32 Bellevue Avenue and, at her invitation and with the consent of the lessee of the premises, Joanne Forbes, the defendant lived at this apartment until his arrest on December 4, 2004.  He slept in a bed in his granddaughter's bedroom and also kept his personal belongings in that bedroom.

On December, 3, 2004 an anonymous female telephoned the Haverhill police department and reported that on the previous night she met a person at a "local billiards" who identified himself as Mark Matthews from Austin, Texas, who was staying in the area while visiting his unidentified daughter.  She said that, after a few drinks, he talked a little too much and told her he was wanted by the FBI and was "staying down the street".  She had seen him sleeping in a truck that was parked at corner of Marshall and Bellevue and, on the night they met, she saw the gun as Matthews was sleeping in the truck.  She did not know the registration of the truck and described it as a yellowish Chevy pick-up truck.

The morning of December 4, 2004 two Haverhill policemen, Paul Malone and Sgt.

Dana Burrill, both of whom were aware of the anonymous tip, approached a Chevy pick up truck at the corner of Marshall and Bellevue Avenue. They were observed by the defendant and Kristle from the kitchen window of their apartment. The police opened the closed door of the truck and searched inside where they found ammunition but no firearm. Krystle went to the back yard area to empty trash. The police questioned her about father. During the questioning she told them that she was in the middle of feeding her baby daughter. She then went inside the apartment, got her daughter, and came back outside. At no time during the questioning did she say that she had observed a gun in her apartment. The police told her they needed to question her further at the police station. She went back into the apartment to get a pair of shoes to wear and came back outside.

      She was then taken to the police station by a female officer who left the station immediately after taking Krystle there and returned to 32 Bellevue Avenue. At the station Krystle was taken to a large, empty room where she waited for approximately 10 minutes before being brought to a smaller room. A different policeman came into that room and told her he wanted to ask her questions about her father and was later taken to another room and told she was to "await the investigation". After waiting in this room for a period of time her daughter needed a diaper change so she left the station with her daughter. As Krystle was walking away from the station she was apprehended by the Haverhill police, placed in police in a police car, and taken back to the station and was further interrogated. At this time the police told her that they had found a weapon in her apartment and asked her if there were any more weapons in the apartment. She responded, "I have no idea". She was asked to sign a consent form for the search of the apartment which had already take place. While in the process of signing the form, one of the police officers took it from her, saying it was no good and she would have to sign another one at the apartment. The

2

police then brought her back to her apartment and arrived there five minutes after leaving the station

Back at her apartment there was a crowd of people, including police and news reporters. She entered the apartment and saw four police officers already inside the apartment. The kitchen cabinets were open, the mattress was pulled off the bed in her bedroom, the baby's mattress was pulled of the crib, and the drawers to the dressers were open and messed up. She observed a gun, which she had never seen before, sticking out from under the bed in the baby's room. She also observed that her father's bag was open and his papers were strewn all over the room. She later noticed that her father's social security card and picture identification were missing from the bureau. All the furniture in the living room had been pulled away from the wall and tipped over. After she had observed the condition of the apartment she was brought into the kitchen and presented with a second consent to search form which she signed while sitting at the kitchen table.

In the meantime, after the Haverhill police took Krystle to the police station, they secured the area and requested assistance from the North Eastern Law Enforcement Council (NEMLEC) Special Weapons and Tactics (SWAT) team. After the SWAT team arrived Lt. Neville, a member of the SWAT team, made a telephone call to the apartment. The call was answered by an answering machine. Neville identified himself and left the message that he would call back in a few minutes. He tried to call several more times without success. Neville then used a loud speaker and instructed the defendant to answer the telephone when it next rang.

The defendant answered the telephone when it next rang. Neville told him that the police wanted to take him into custody and to come out of the building when instructed. In response to questions, the defendant said he was unarmed. He was told to come out the

front door, facing Belleview Street, and not to have anything in his hands. He left the building with his arms raised and, once out of the building, was apprehended by several members of the SWAT team, placed in a prone position on the ground and handcuffed. They then took him to the top of the street and turned him over to the Haverhill police. According to the report of the incident by Sgt. Paul Cooper, after the SWAT team turned the defendant over to the Haverhill police, they made a "protective sweep of the residence". One of the SWAT team members went into the bedroom and, according to the report, "was looking under the bed but his view was blocked by several items". He removed those items from under the bed and in doing so, "removed an Army type mat that was rolled up". From within the mat a sawed-off shotgun fell to the floor. The weapon was rolled up in some type of towel. All that was visible was the sawed-off handle.

After the defendant was brought to the police station he was asked if he was Mark Matthews and he said that he was. He was later booked and fingerprinted. During the booking process the police told him they had found a weapon in his daughter's apartment and asked him if there were any more weapons there. The defendant answered that he had no idea if there were any other weapons in the apartment. The interrogation stopped at that time but he was later brought into another room, advised of his rights for the first time, and asked more questions. This interview was recorded. The interviewer told the defendant that they had his daughter and he should tell them about gun that was found in her apartment and not let her "go down" for having a gun in her apartment. The defendant understood this to mean that they were going to charge his daughter with a criminal offense relating to the gun. Because he was concerned for his daughter, he told them she had nothing to do with the gun and to keep her out of it. He then admitted that the gun was his. He made this admission only because the gun had already been found in the apartment

4

and the threat that his daughter would be charged with possession of the gun.

## ISSUES PRESENTED

A. Did the warrantless search of the defendant's truck violate the Fourth Amendment to the Constitution of the United States?

B. Did the warrantless search of Kristle Matthews' apartment and the defendant's bedroom violate the Fourth Amendment to the Constitution of the United States?

C. Were the defendant's custodial statements to the police voluntarily and freely made?

## ARGUMENT

A. TRUCK SEARCH

There was no probable cause for the police to enter and search the truck. The police were acting upon the anonymous telephone tip received at the police station the night before. Illinois v. Gates, 462 U.S. 213, 238, eased the rigidity of the "two-pronged" informant test of Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S 410 (1969), and adopted a "totality-of-the-circumstances analysis", yet it still required that all the facts, including the "veracity" and "basis of knowledge" of the persons supplying hearsay information must be considered. The facts in this case fall short of satisfying this totality-of-the-circumstances test as interpreted in U.S. v. Barnard, 299 F. 3d 90 (1st Cir, 2002), cited in U.S. v. Greenburg, 2005 U.S. App. Lexis 1081 ( 1st Cir, dec. June 3, 2005).

B. APARTMENT SEARCH

It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 576 (1980). The only exception to this Constitutional requirement is (a) the existence

5

of exigent circumstances which may authorize what is sometimes referred to as a "sweep search", or (b) voluntary consent.

    1. Exigent Circumstances.

The SWAT team made a "sweep search" of the apartment after the defendant was arrested and in custody outside the apartment. The Supreme Court defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. They are narrowly confined to a cursory visual inspection of those places in which a person might be hiding" <u>Maryland v. Buie, 494 US 325, 327 (1990)</u>. It is "aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises". <u>494 US, 335, 336.</u>

The search in this case occurred after the defendant was arrested and while in the custody of the Haverhill police, some distance from the apartment. There was no indication that another person was in the apartment who presented a danger to the arresting officers or anyone else. The sweep was not narrowly confined nor was it a cursory visual inspection. Rather, it was a full blown search. The furniture in the living room was turned upside down. Mattresses in both bedrooms were pulled off the bed, the kitchen cabinets were searched, the drawers to the dressers were searched, the defendant's bag was opened and its contents were strewn all over the floor and items were removed from a bureau in one of the bedrooms. It is submitted that the facts in this case do not amount to exigent circumstances that would justify a sweep search of the apartment and, in any event, the search exceeded the permissible scope of a sweep search.

2. Consent

Any attempt to justify the search as a consent search is not supported by the facts. Krystle's consent, given after she had been told that a search had already been made, was no consent at all. Consent must be given before a search is made, not afterward.

Secondly, her consent was not voluntarily given. She consented only after being detained at the police station for a considerable period of time with her young child for no valid reason. When she was later brought back to her apartment and observed its condition she knew that the apartment had already been searched and a gun was found. She was untrained in the law and was not aware of the legality of the search. It is submitted that, in her mind, withholding consent at that time would have been pointless.

C. DEFENDANT'S CUSTODIAL STATEMENTS

If the search of the apartment violated of the Fourth Amendment, the defendant's admission at the police station, after the search had been made and after the gun was found, was the fruit of the illegal search and must be suppressed.

Additionally, he admitted ownership of the gun in order to prevent unfounded criminal charges bring brought against his daughter. The threat of lodging criminal charges against his daughter was purposefully made and amounted to coercion, rendering his admission involuntary.

Based upon the foregoing, it is respectfully submitted the warrantless searches of the truck and the apartment at 32 Belleview Avenue, Haverhill, Massachusetts were made without probable cause, were not accompanied by exigent circumstances, and were not voluntarily assented to and, therefore, any and all items seized during said searches be suppressed. The defendant further submits that any and all statements he made while at the Haverhill Police station were the fruits of an illegal search and seizure, were not freely

made but were coerced and must therefore be suppressed.

                                      Respectfully submitted
                                      Mark Matthews
                                      By his attorney,

                                      <u>/s/Paul F. Markham</u>

                                      Paul F. Markham
                                      PO Box 1101
                                      Melrose, MA 02176
                                      781-665-1800
                                      B.B.O. 320820

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA                                    05-CR-100073-NG

    vs

MARK MATTHEWS

## MOTION TO SUPPRESS

Now comes the defendant, Mark Matthews, and moves to suppress the following:

1. Any and all items, including a Remington, model 870, 16 gauge pump action shotgun, Serial No. 68750W that was seized from the premises at 32 Bellevue on December 4, 2004.
2. Any and all items seized from a truck bearing Texas Registration 6GGF73, that was parked on Marshall Street, Haverhill, Massachusetts, on December 4, 2005.
3. Any and all statements made by Mark Matthews at the Haverhill Police Station on December 4, 2004.

The defendant submits that the above listed items were seized during a warrantless search of the said premises and truck. The defendant's statements were the fruit of the said searches, made after the defendant was arrested without a warrant or probable cause, were the product of coercion and not freely made. All in violation of the Fourth Amendment to the Constitution of the United States.

The defendant relies upon the memorandum filed herewith in support of this motion.

## REQUEST FOR ORAL ARGUMENT

It is respectfully requested that the Court hear oral argument on this motion and submits that oral argument will assist the Court in deciding this motion.

    Respectfully submitted
    Mark Matthews
    By his attorney,

    /s/ Paul F. Markham
    Paul F. Markham
    PO Box 1101
    Melrose, MA 02176
    781-665-1800
    B.B.O. 320820