IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  ) CRIMINAL NO. 05-CR-10073-NG
          v.                      )
                                  )
MARK MATTHEWS                     )

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The government opposes the defendant's motion to suppress ammunition, a gun, and inculpatory statements.  In his motion, the defendant claims that: 1) the search of his truck was invalid; 2) the search of his daughter's apartment was invalid; and 3) statements he made after his arrest were both coerced, and the fruits of an illegal search.  For the reasons discussed in detail below, the defendant's motion to suppress should be denied.

### I.  STATEMENT OF FACTS[1]

The government anticipates that testimony and evidence presented at the suppression hearing will reveal the following:

### 1.  The Standoff

On December 3, 2004, an anonymous caller told the Haverhill Police Department ("HPD") that she had met Mark Matthews, the defendant, at a bar the night before and that after a few drinks, he told her that the FBI had warrants outstanding against him

---

[1]These facts have been gleaned from police reports, witness interviews, consensually recorded conversations, and grand jury testimony.

from Texas.  The anonymous caller also said that the defendant
had a primer-colored truck with Texas plates, that he parked in
the Bellevue Avenue/Marshall Street area of Haverhill, that she
had seen him sleeping in the truck a few times, and that she had
seen a shotgun in his truck.  The anonymous caller also said that
the defendant told her that no one could trace him to
Massachusetts because the truck did not belong to him.  The
anonymous caller said that the defendant was staying in the
neighborhood with his daughter and that the daughter had a baby,
but that the daughter didn't know anything about the defendant's
legal problems.[2]

At approximately 9:30 AM on December 4, 2004, Sgt. Berrill
and Officer Malone of the HPD located a primer-colored truck with
Texas license plates at the corner of Bellevue Avenue and
Marshall Street, where the anonymous caller had predicted the
truck would be.  The passenger door to the truck was unlocked.
Believing that the shotgun described by the caller was inside,
Sgt. Berrill opened the door to the truck and discovered 3 rounds
of ammunition for a Winchester rifle, 3 rounds of .9 mm
ammunition in a plastic bag next to the passenger's seat, and a
piece of paper with several license plate numbers written on it.

---

[2]It is unclear from the recording of the call whether the
anonymous caller was referring to the defendant's outstanding
warrants or the defendant's shotgun.  The caller merely stated
that the defendant told her that his daughter "doesn't know
anything about that."

While the officers were running the licence plate numbers, a woman came out from 32 Bellevue with a bag of trash.  Sgt. Berrill asked the woman several questions about the truck. Though initially reluctant, in the course of the conversation the woman told Sgt. Berrill that:

- Her name was Kristle Matthews,
- Her father Mark, the defendant, owned the truck;
- The defendant was watching the police from a window in the house;
- The defendant had a gun in her baby's room;
- The defendant was a former Navy SEAL, he was wanted in Texas, he was a violent man, and he would not give up without a fight.

Sgt. Berrill asked Ms. Matthews to go back inside the house and see if the gun was still there.  When she returned, she appeared to be nervous, said that the gun was no longer in her baby's room, and that the defendant was hiding in a bedroom with the door closed.  At that point, Sgt. Berrill instructed Ms. Matthews to get her baby out of the house and go with another officer back to the police station, which she did.  Ms. Matthews stated that at no time did she feel she was being held at the police station against her will.

Sgt. Berrill confirmed with other HPD officers that the defendant had a lengthy criminal history, and that there were two outstanding warrants from Texas against him, including one for unlawful possession of a firearm.  HPD then evacuated and secured the area and called for a SWAT team to negotiate with the defendant.

## 2.  The SWAT Team

The SWAT team assembled at 32 Bellevue at approximately 11:00 AM.  Lt. Neville of the SWAT team then went to the police station to interview Ms. Matthews.  During that interview, Ms. Matthews told Lt. Neville that:

- There was no one else in the house;
- The defendant was a former Navy SEAL;
- The defendant had been staying with her for about a month;
- The defendant had a sawed-off shotgun in the house, and another gun, possibly in the truck.
- The defendant may also have some muriatic acid that he could throw at police.
- She had seen the defendant inject himself with a syringe on one occasion a month ago, and that he smoked marijuana.
- The best thing for her would be for the defendant to kill himself, or be killed by the police.
- Some type of incident occurred recently between the defendant and either Ms. Matthews or her daughter, but she would not elaborate on the nature of the incident.

Ms. Matthews also helped Lt. Neville draw a map of the inside of 32 Bellevue. Lt. Neville returned to the scene and related the substance of his interview with Ms. Matthews to the rest of the team.  The team then attempted to contact the defendant by telephone.  After several unsuccessful attempts, they established communication with him and convinced him to surrender.  He emerged from the house unarmed at 1:48 PM and was taken into custody.

## 3.  The Sweep

The SWAT team then conducted a protective sweep of the house, to search for booby traps or other armed individuals. During the course of this sweep, Sgt. Towle of the SWAT team

4

looked underneath a bed in the bedroom.  The bed is a regular
twin-size bed supported by a metal frame, with enough space
underneath for someone to hide.  Sgt. Towle's view underneath the
bed was obstructed by several items.  He removed these items, one
of which appeared to be a rolled-up Army-type mat.  As he removed
the mat, an item wrapped in a towel fell to the floor.  Sgt.
Towle immediately recognized the item as a sawed-off shotgun.  A
SWAT officer was posted at the bedroom door to guard the gun, and
HPD was notified of the discovery.

Meanwhile, Ms. Matthews waited at HPD with Officer Powell
and Father Mike Randone, also an officer.  As the defendant was
being taken into custody, and around the same time that the SWAT
team began its search, Sgt. Burrill sent an officer back to the
police station to inform Ms. Matthews of the developments.  Sgt.
Burrill relayed the discovery of the shotgun during the
protective sweep to Officer Powell and Father Randone, who told
Ms. Matthews.  Officer Powell then had her sign a consent waiver
authorizing a search of her home.  According to Ms. Matthews, she
did not feel threatened or forced in any way to sign the waiver.

Sgt. Burrill then asked the officers at the police station
to bring Ms. Matthews back to the house.  At approximately 2:30
PM, Ms. Matthews, Burrill, and Burrill's superior, Capt.
Thompson, entered the house and immediately went into the
kitchen.  According to Sgt. Burrill, although breakfast was still

5

on the table, the kitchen otherwise appeared to be undisturbed and relatively neat.  In the other rooms, the SWAT team had moved some of the furniture in order to search for individuals or booby traps.  While in the kitchen, Capt. Thompson asked Ms. Matthews to sign a second consent waiver authorizing a search of her home and seizure of any weapons.  Capt. Thompson interviewed Ms. Matthews on tape while she signed the second consent waiver. Capt. Thompson indicated to Ms. Matthews that the SWAT team had already found a shotgun in the house.  Kristle stated that she understood the waiver, and that she would allow a search of her house and seizure of any weapons.  Capt. Thompson and Sgt. Burrill then went to the bedroom and seized the gun.  Nothing on the tape indicates that Kristle was forced or coerced in any way to give her consent.  To the contrary, Capt. Thompson specifically told Kristle that she could refuse to give consent.

**4.  The Confession**

After being taken into custody, the defendant was taken to the police station.  During the booking process, officers asked him if he had any guns in the house.  The defendant initially said no.  Officers then told him that they had found a shotgun, and that for the safety of his daughter and granddaughter he should tell them of any other guns.  The defendant then stated "if you're telling me that you found a shotgun then there is no other guns in the house."

The defendant was then brought to Sgt. Burrill's office, where he signed a Miranda card and was questioned about the truck and the gun. He admitted that the gun was his, then asked for an attorney. Sgt. Burrill immediately stopped questioning him and had Officer Malone and Detective Spero take him back to the booking room to be fingerprinted. While being taken back to the booking room, the defendant without being asked any questions told Detective Spero that he didn't want his daughter or granddaughter to get involved, that the gun belonged to him, and that he brought it to Massachusetts from Texas.

After being incarcerated at Essex County Jail pending trial, the defendant made several consensually-monitored phone calls from prison telephones. On December 29, 2004, during one of these calls, the defendant stated that "the little, you know, that little thing that I had is like, hey, you know, I wasn't out acting stupid. I wasn't pointing it at nobody. I wasn't threatening nobody."

## II.  ISSUES PRESENTED

At the outset, the government notes that the defendant is not charged in the indictment with possession of the ammunition found in his truck. Indeed, the government does not intend to rely on any of the evidence seized from the defendant's truck in its case-in-chief. Thus, there are only two issues before this court: 1) the admissibility of the shotgun found in Kristle

Matthews' apartment, and 2)the admissibility of the defendant's statements made to HPD after his arrest.

### III.  ARGUMENT

The "touchstone of the Fourth Amendment is reasonableness." Ohio v. Robinette, 519 U.S. 33, 39 (1996)(internal citations removed).  Reasonableness is measured "in objective terms by examining the totality of the circumstances."  Id.  The reasonableness test is "fact-specific" in nature, and lacks any "bright line rules" or "litmus-paper test[s]."  Id.

### 1.   The Shotgun Found At 32 Bellevue Is Admissible

#### A.   The Search of 32 Bellevue Complied with the Exigent Circumstances Exception to the Fourth Amendment

Ordinarily, a search must be executed pursuant to a warrant in order to be reasonable.  Katz v. United States, 389 U.S. 347, 357 (1967).  However, a warrantless search is nonetheless reasonable if it satisfies one of several established and well-delineated exceptions to the warrant requirement.  Id.  One such exception allows the police to search a residence where exigent circumstances exist.  Warden v. Hayden, 387 U.S. 294, 298 (1967); see also United States v. Bartelho,71 F.3d 436, 442 (1st Cir. 1995); United States v. Lopez, 989 F.2d 24, 26 (1st Cir. 1993).

Exigent circumstances exist where law enforcement officers have probable cause for a search and a reasonable basis to believe that their safety or the safety of the general public is

8

threatened.  <u>Lopez</u>, 989 F.2d at 26, citing <u>Warden v. Hayden</u>, 387 U.S. 294, 298-99 (1967).  In determining whether both prongs of this test are satisfied, courts examine the objective facts available to the police at the time the decision to search was made.  <u>United States v. Wihbey</u>, 75 F.3d 761, 766-768 (1st Cir. 1996).

In this case, with respect to the first prong, probable cause was established by several objective facts that were available to HPD and the SWAT team at the time they decided to enter 32 Bellevue.  The police knew from the anonymous caller that the defendant possessed a shotgun.  They knew that Kristle Matthews had corroborated the anonymous caller's statements about the defendant possessing a shotgun.  They knew that the shotgun was not in the defendant's truck.  They knew from Kristle Matthews that the defendant had just moved to Massachusetts and was residing temporarily at 32 Bellevue.  They knew by examining the defendant's criminal history that he was a convicted felon. They knew from Kristle Matthews that the defendant had recently traveled in interstate commerce with his belongings from Texas. Finally, they knew that upon seeing the police outside 32 Bellevue, the defendant ran and hid inside a bedroom closet.  In short, at the time they decided to enter 32 Bellevue, the police had probable cause to believe that the defendant was a felon in possession of a firearm, and that the firearm was somewhere

inside 32 Bellevue.

The police also satisfied the second prong of the exigent
circumstances test, because they had a reasonable basis to
believe that 32 Bellevue posed a threat both to their own safety
and to the safety of the general public, even after the defendant
had exited the house.  Lopez, 989 F.2d at 26.  This threat was
based on a number of facts.  The police had reason to believe
that the defendant was a Navy SEAL officer with weapons training.
The police also had reason to believe that the defendant kept
pellets filled with muriatic acid inside the house.[3]  The police
also knew that the defendant had barricaded himself inside the
house for several hours, ignoring repeated phone calls from the
SWAT team negotiators.  Kristle Matthews also gave the police
reason to believe that the defendant was a violent man and would
rather die than go back to jail.  That he in fact surrendered
quietly and unarmed gave them ample reason to believe that he may
have booby-trapped the house, either with the muriatic acid or
the gun, or both, in anticipation of a forced entry by the SWAT

---

[3]Muriatic acid is an archaic term for the substance more
commonly known as hydrochloric acid.  According to the United
States Environmental Protection Agency, short-term dermal
exposure to hydrochloric acid causes severe burns, ulceration,
and scarring.  Short-term airborne exposure causes, among other
things, inflammation and ulceration of the respiratory tract,
chest pain, and pulmonary edema, or fluid accumulation in the
lungs, which can be fatal.  U.S. EPA Technology Transfer Network
– Air Toxics Website (2005), available at http://www.epa.gov/
ttn/atw/hlthef/hydrochl.html.

team.  Indeed, under these circumstances it would have been
manifestly unreasonable for the police to fail to clear the house
immediately of any potential booby traps.  In short, the police
here satisfied both the probable cause and the reasonable basis
prongs of the exigent circumstances test.

> **B.    The Police Would Have Inevitably Discovered The Shotgun**

Even if this court finds that the exigent circumstances
exception does not apply, the sawed-off shotgun should still be
admissible based on the inevitable discovery exception.  This
exception applies "to any case in which the prosecution can show
by a preponderance of the evidence that the government would have
discovered the challenged evidence even had the constitutional
violation to which the defendant objects never occurred."  United
States v. Scott, 270 F.3d 30, 42 (1st Cir. 2001), citing Nix. v.
Williams, 467 U.S. 431, 440-48 (1984).  In order to meet this
burden, the prosecution must establish three elements: first,
that the legal means used to discover the evidence were truly
independent from the illegal means; second, that the legal means
and the discovery by that means were truly inevitable; and third,
that application of the inevitable discovery doctrine neither
provides an incentive for police misconduct nor significantly
weakens the Fourth Amendment.  Scott, 270 F.3d at 42.

All three elements are satisfied here.  With respect to the
first element, HPD secured Ms. Matthews' consent to search the

11

house for weapons not once, but twice.  She stated unambiguously that on both occasions her consent was knowing and voluntary.  On the second occasion, she was specifically offered an opportunity to refuse consent, but did not do so.  Both consent waivers were truly independent from the SWAT team's entry into 32 Bellevue on exigent circumstances, since well before the entry HPD had probable cause to believe that the defendant possessed a sawed-off shotgun in or around the bedroom.  Even though consent was obtained after the gun was found, "there is no strict requirement [under the inevitable discovery doctrine] that the alternate legal avenue of investigation be actively pursued at the time of the illegal search or seizure."  Scott, 270 F.3d at 43, n.7.  Moreover, "[t]he question of inevitable discovery will certainly be easier if the government has probable cause to search or to arrest before undertaking the illegal search," as was the case here.  Id.

The government can also satisfy the second element of Scott. HPD had probable cause to believe that defendant had a gun in the house, and knew that he emerged from the house unarmed.  Thus, they would inevitably have discovered the gun during the consensual search when they went into the house with Kristle, even if the SWAT team had not looked under the bed during its protective sweep.

Finally, with respect to the third element, whether

application of the inevitable discovery doctrine in this case
would encourage police misconduct or otherwise weaken the Fourth
Amendment, "[s]uch an analysis necessarily dwells closely on the
facts of a particular case.   Moreover, a court in conducting
this analysis must bear always in mind the social costs of the
exclusionary rule." <u>Scott</u>, 270 F.3d at 45.   The facts here
suggest minimal encouragement of police misconduct, if any.
There was little incentive for the SWAT team to conduct an
illegal search for the gun, particularly since they knew that
Kristle was cooperating with HPD.   In fact, upon discovering the
gun while securing the house, the SWAT team did not seize it;
Rather, they left it where it was in the bedroom, and placed one
officer at the entrance to the room to guard it until it could be
seized lawfully.   Bearing "in mind the social costs of the
exclusionary rule," this court should not permit a dangerous
defendant to go free in a situation where the police otherwise
acted professionally and reasonably.   <u>Id</u>.   In short, even if
exigent circumstances do not exist, the gun should be admissible
under the inevitable discovery doctrine.

    The First Circuit has yet to apply the inevitable discovery
rule to a post-arrest sweep of a house by a SWAT team.   However,
the Sixth Circuit did so in a case with strikingly similar facts
as those at issue here, and denied the defendant's motion to
suppress.   <u>United States v. Pihlblad</u>, 142 F.3d 437, 1998 WL

165150 (6th Cir. 1998)(unpublished).   In Pihlblad, the defendant,
a convicted felon, barricaded himself inside a house with a
rifle.  Id. at 1.  The only other resident of the house, the
defendant's friend Misty, fled and told police that the defendant
was armed, had taken drugs, and was threatening to commit
suicide.  Id.  The police had reason to believe that the
defendant was the only person left in the house after Misty fled.
Id.  After a prolonged standoff, the defendant emerged unarmed.
Id.  A SWAT team then went into the house to conduct a protective
sweep, and discovered the rifle.  Id.  After the discovery of the
rifle, the resident signed a consent-to-search form.  Id.  The
Sixth Circuit found that the protective sweep and exigent
circumstances exceptions to the Fourth Amendment did not apply,[4]
but that the gun was nonetheless admissible under the inevitable
discovery doctrine.  Id. at 5.  The Sixth Circuit specifically
noted that although "consent was obtained only after the [SWAT
team] had searched the house and recovered the rifle, it is

---

[4]Under the protective sweep exception to the Fourth
Amendment, the police may make a protective sweep of a house
after arresting a defendant, inside or outside the house, if the
police have a reasonable basis to believe that the house harbors
another individual who poses a threat to their safety or the
safety of others.  United States v. Lawlor, 406 F.3d 37, 41 (1st
Cir. 2005), citing Maryland v. Buie, 494 U.S. 325 (1990).  The
government does not raise a protective sweep exception argument
here, because the police did not have reason to believe that
there was anyone else in the house after the defendant emerged.
The government reiterates, however, for the reasons described in
Section III.1 above, that unlike in Pihlblad the exigent
circumstances exception does apply to this case.

obvious that if the officers had waited to conduct the search until Misty consented, they inevitably would have found the rifle." Id. at 5.  The essential facts in Pihlblad and this case are virtually identical.  Thus, even if this court finds that the exigent circumstances exception does not apply, the gun should still be admissible, as it was in Pilhblad, under the inevitable discovery doctrine.

**2.    The Confessions by the Defendant Are Admissible**

The government notes that the defendant has not moved to suppress the consensually recorded statements he made from the Essex County Jail, in which he stated that "the little, you know, that little thing that I had is like...I wasn't pointing it at nobody...I wasn't threatening nobody."  Thus, at issue before this court are only those statements that the defendant made at the police station.

**A.    The Defendant Was Not Coerced**

A custodial confession by a defendant is admissible at trial if the government can show by a preponderance of the evidence that the police did not engage in coercive conduct in eliciting the confession.  Colorado v. Connelly, 479 U.S. 157, 164 (1986); see also Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990).  The crucial determination is whether the police overreached in such a way as to overbear the will of the accused.  Jackson, 918 F.2d at 241

(internal citations removed).  In making this determination, "the reviewing court must examine the entire record and make an independent determination of the ultimate issue of voluntariness."  Id. (internal citations and quotations removed).

In Jackson, the defendant sought to suppress a confession he gave after the police told him that his sister had been taken into custody.  Id. at 242.  The defendant there argued that psychological coercion generated by concern for a loved one may make a confession involuntary.  Id.  The First Circuit rejected this argument on three grounds.  First, they found that the sister was an adult, and not a child.  Id.  Second, they found that the relationship between the defendant and his sister was not particularly close, and thus not particularly susceptible to coercion.  Id.  Third, and crucially, they found that the defendant had "very substantial experience with the criminal justice system," and was thus unlikely to be swayed by any threats against his sister.  Id.  Compare Lynumn v. Illinois, 372 U.S. 528 (1963) (defendant's confession coerced where police threatened her that financial aid for her infant children would be cut off and her children would be taken away from her if she did not cooperate); United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981) (defendant's confession coerced where police threatened her, while she was sobbing and shaking, that she would not see her two-year old child for a long time if she did not

cooperate).

The three grounds upon which the First Circuit relied in
Jackson are all present here.  First, Ms. Matthews is an adult,
and has apparently lived on her own in Massachusetts for some
time while the defendant was in Texas.  Second, the relationship
between the defendant and his daughter was not by any reasonable
stretch of the imagination a "particularly close" one.  Jackson,
918 F.2d at 241.  To the contrary, according to the anonymous
caller the defendant had slept in his truck outside 32 Bellevue
on more than one occasion.  More importantly, Ms. Matthews told
Sgt. Towles of the SWAT team that some type of incident had
occurred between the defendant and her or her daughter, and that
"the best thing for [Ms. Matthews] would be for [the defendant]
to kill himself or be killed by the police."  Third, as in
Jackson, the defendant here had very substantial experience with
the criminal justice system, and thus was simply not susceptible
to the kind of coercion he claims he was subjected to by HPD.

Most telling, however, is that Capt. Thompson specifically
asked the defendant whether his confession was truthful, or
whether he was merely trying to protect his daughter.  The
defendant repeatedly said, "no, that's the truth."  Thus, looking
at the totality of the circumstances, there is absolutely no
indication that the police coerced the defendant by threatening
his daughter.

**B.    The Confessions Were Not The Fruits Of An Illegal Search**

The defendant claims that the confessions he made at HPD were the fruits of an illegal search.  As discussed above, the search was not illegal because it complied with the exigent circumstances exception to the Fourth Amendment.  <u>See</u> Section III.1.A, <u>supra</u>.  Even if the exigent circumstances exception did not apply, the discovery of the gun, and any ensuing admissions by the defendant, were inevitable in light of Kristle Matthews' consent.  <u>See</u> Section III.1.B, <u>supra</u>.

In any event, even if this court finds that the search of 32 Bellevue was an illegal search, under the "fruit of the poisonous tree" doctrine a confession can be admissible obtained "by means sufficiently distinguishable to be purged of the primary taint." <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963).  In this case, the defendant initiated a conversation with Detective Spero while being taken to the HPD booking room in which he, unprompted, admitted possession of the shotgun.  That the defendant initiated this conversation and, without being asked, voluntarily admitted possession of the shotgun strongly indicates that this confession was obtained "by means sufficiently distinguishable" from the search at 32 Bellevue.  <u>Id.</u> Accordingly, it should be admitted.

18

## IV.  CONCLUSION

WHEREFORE, for the reasons stated above, the government respectfully requests the Court deny the defendant's motion to suppress statements.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                        By:  /s/ S. WAQAR HASIB
                              S. WAQAR HASIB
                              Spec. Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I hereby certify I have caused a copy of the foregoing document to be served on counsel of record via electronic filing this 30th day of June, 2005.

                              /s/ S. WAQAR HASIB
                              S. WAQAR HASIB
                              Spec. Assistant U.S. Attorney