UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     v. | )    CR. NO. 05-10073-NG |
| | ) |
| MARK D. MATTHEWS, | ) |
|     Defendant. | ) |

GERTNER, D.J.:

MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS
March 1, 2006

I.  INTRODUCTION

Defendant Mark D. Matthews ("Matthews") moves this Court to suppress the results of the December 4, 2004 search of his truck and the house in which he was staying and all statements he made to the Haverhill Police that day.

The United States Attorney's office seeks to use the "exigent circumstances" exception to justify a warrantless search conducted by local police officers.  As in United States v. Dessesaure, 314 F. Supp. 2d 81 (D. Mass. 2004), overruled on other grounds, 429 F.3d 359 (1st Cir. 2005), police here invoked words like "protective sweep" and "exigent circumstances" to justify their search, but these phrases are meaningless mantras unless they are connected to supporting facts.  The "exigent circumstances" exception to the Fourth Amendment warrant requirement, like the concept of "protective sweep," cannot be read to allow warrantless searches based simply on probable cause to believe there is a gun in an unoccupied apartment to which the defendant has no access.  To allow such a search would be to

carve out a wholly new Fourth Amendment exception to the warrant requirement entitled "home searches for guns."

Indeed, as I have previously noted, I have serious concerns that these cases are not screened in the United States Attorney's office as carefully as they should be, and that prosecutors are prepared to argue whatever rationale – however thin – that will justify a search for weapons or contraband.  As I noted in United States v. Dessesaure, 323 F. Supp. 2d 211, 213-4 (D. Mass. 2004) *overruled on other grounds*, 429 F.3d 359 (1st Cir. 2005):

> The government counters [defendants' claim of an illegal search] with a non-sequitur by stating, 'it is appropriate to note at the outset that [Dessesaure] is the prototype of the criminal that Congress had in mind when it enacted certain statutes to combat gun and drug violence,' as if Congress were suggesting that a defendant who fits a certain prototype forfeits his constitutional rights. The United States Attorney's Office is obliged to screen its prosecutions to determine whether they conform to federal constitutional standards, regardless of the defendant's past history or present conduct. Perhaps other counsel would not have been as vigilant as Dessesaure in moving to suppress an unlawful search; perhaps other counsel would have encouraged him to plead guilty or cooperate. That does not detract from the government's independent obligation here to screen its prosecutions to determine their fealty to constitutional – federal constitutional – law, not an abstract reference to "certain statutes" or 'prototypes.'[1]

---

[1] The comment of one scholar is instructive. Referring to the relationship between federal prosecutors and federal agents (which applies equally well to federal prosecutors and local police), he said:

Like <u>Dessesaure</u>, this case rests on an illegal search. Having reviewed the parties' memoranda and conducted a hearing on the issue, I hereby **GRANT** defendant's motion to suppress [document #8].

## II.   <u>FACTS</u>

### A.   <u>The Car Search</u>

On December 3, 2004, the Haverhill police received an anonymous phone call from a woman who claimed to have been drinking with the defendant the night before.  She reported that he was wanted in Texas on an outstanding warrant, that she knew where the defendant's truck was parked, and that he had a gun in the truck.  At 9:30 a.m. the next morning, police found a car matching her description of the truck's color and location.  No one was in or near the car at the time; no contraband was in

---

In many respects, the relationship between federal law enforcement agencies and federal prosecutors is like the relationship between a client and an attorney. Federal prosecutors depend upon the investigating agencies to bring them cases – both the quantity of cases that will bring increasing allocation of resources... and the quality of cases that will bring increasing attention to the particular prosecutor's office . . . As with attorneys in private practice, those clients with repeat business are particularly valuable. So federal prosecutors have an interest in preserving their relationships with federal law enforcement agencies so that those agencies do not start bringing their cases elsewhere. The resulting pressure that federal prosecutors feel to accept cases brought to them by federal agencies makes it particularly important that the agencies receive guidance before commencing an investigation.

Michael A. Simons, <u>Prosecutorial Discretion and Prosecution Guidelines: A Case Study in Controlling Federalization</u>, 75 N.Y.U. L. Rev. 893, 958 n.301 (2000).

plain view.  Nevertheless, the police deemed the truck a "public safety issue" and opened its unlocked doors.  They found ammunition but no gun inside.

While the police were near the car,  Matthews' daughter, Krystle Matthews, emerged from her house and identified the car as belonging to her father.  Police at the scene then contacted other officers and confirmed what the anonymous caller had told them: that there were two outstanding Texas warrants for Matthews' arrest.  Gov. Opp'n to Def. Mot. to Suppress [hereinafter "Gov. Opp'n"] at 3.

### B.   <u>The House Search</u>

Ms. Matthews told police that her father and her baby were in the house, and that there might be a sawed-off shotgun, crystal methamphetamine, and a hypodermic needle inside.  Police also allege that Ms. Matthews told them that defendant was a former Navy SEAL who had muriatic acid (also known as hydrochloric acid) in the apartment to throw at police if they came after him.  At the direction of the police, she went inside and retrieved her baby; officers then accompanied her to the police station.  <u>Id.</u>

Meanwhile, around 9:00 a.m., other officers secured the perimeter around the apartment and awaited the SWAT team, which arrived at approximately 11:00 a.m. Supp. Hr'g Tr., Aug. 29, 2005;  Gov. Opp'n at 4.  Using a bullhorn and telephone, the

police asked  Matthews to leave the residence.  He did, exiting
unarmed through the front door with his hands up.  The police
took him into custody at approximately 1:48 p.m.  Id.

Once Matthews was in custody and his daughter was at the
police station, the police had no reason to believe anyone else
was in the house.  Indeed, during the nearly five hours they had
been waiting outside, police had not seen anyone other than
Defendant and his daughter enter or exit the home.  Sergeant
Towle, the SWAT operator, conceded that police had no information
whatsoever to suggest that anyone was inside or that there was
any immediate threat.  Nevertheless, they entered the house and
searched because of what the officers claimed were "exigent
circumstances."  Gov. Opp'n at 8.

Perhaps concerned about the legitimacy of their "exigent
circumstances" justification for the search, officers at the
police station explained to Ms. Matthews that they had already
searched her home and found a shotgun inside.  *After* presenting
this information, they asked her to consent to a police search of
her home.  Gov. Opp'n at 5.  Ms. Matthews signed the waiver.

The police then took Ms. Matthews back to her house.  She
told the Grand Jury that she saw ten or fifteen officers inside
"looking around the house."  She testified that "all my kitchen
cabinets were opened, stuff was on the floor . . . some of my
plants had been knocked over.  I looked at my bedroom, my

mattress had been thrown off the bed . . ."[2]  Def. Ex. 5 at 14.
The government disagrees; Sergeant Burrill, one of the officers
at the scene, described the house as relatively neat after the
search, though some furniture had been moved.  Gov. Opp'n at 6.

Regardless of the state of the house, no one disputes that
Ms. Matthews was aware a search had already occurred.  Standing
inside the threshold of the Matthews' home, police again told Ms.
Matthews that a shotgun had already been found during their prior
search and asked her to sign a consent waiver.  Gov. Opp'n at 6.
She signed the second form.

Questioned before the Grand Jury about the voluntariness of
her consent, Ms. Matthews was equivocal.  On the one hand, she
said:

> Q:   [D]id you feel threatened in any
>       way at that point to give consent?
> A:   No, I did not.
> Q:   Did you feel coerced in any way?
> A:   No.

Def. Ex. 5 at 17.

On the other hand, she said:

> Q:   Okay.  And any way forced into
>       giving consent?
> A:   Yes.

Id.

The U.S. Attorney did not question her further about the
apparent discrepancy in her testimony.

---

[2] Ms. Matthews did not testify at the suppression hearing.  The parties
agreed that her affidavit and Grand Jury testimony could be admitted in lieu
of her live testimony at the hearing.

During the nearly five hour period in which they surrounded the Matthews' residence, police made no effort to secure a warrant.  Indeed, police officers testified at the hearing that there was not even a discussion about doing so. Supp. Hr'g Tr. Apparently, they did not think one was necessary.

During the "exigent circumstances" search, conducted after Defendant and his daughter had left the house, Sergeant Towle looked under a bed, pulled out a mat that "came unrolled" and revealed a sawed-off shotgun wrapped in a towel.  At that point, they found what they were looking for.

C.   **Matthews' Statements**

At the police station, at approximately 3:00 p.m., after the search of the house had already revealed the shotgun and after police had informed Matthews of this discovery, defendant signed a Miranda waiver.  He admitted that the firearm that had been found in the house belonged to him.  Supp. Hr'g Tr.

III. **LEGAL ANALYSIS**

A.   **The Truck Search**

The police did not have sufficient cause to search the defendant's truck based on a single anonymous telephone tip. They had no past experience with the informant.  To the extent they corroborated her information, it was only by confirming the existence of a car on a public street where she said it would be located.  It was not until after Matthews' daughter confirmed

that it was his truck, and that there were outstanding warrants for Matthews' arrest, that the police had anything like probable cause to search it.  At the time, however, and consistent with their cavalier attitude toward constitutional rights, the police did not think they needed to wait to get more information; they would justify a warrantless search on less than probable cause because of "public safety."

But while I conclude that this is not sufficient to meet the government's burden, <u>see</u> <u>Illinois v. Gates</u>, 462 U.S. 213 (1983); <u>United States v. Barnard</u>, 299 F.3d 90 (1st Cir. 2002), I do not have to address this issue.  The government has stated that it does not intend to rely on any evidence from the truck in its case-in-chief.  Gov. Opp'n at 7.

**B.    <u>The House Search</u>[3]**

A home merits the utmost level of protection under the Fourth Amendment.  <u>See</u>, <u>e.g.</u>, <u>United States v. Martins</u>, 413 F.3d 139, 146 (1st Cir. 2005); <u>Kyllo v. United States</u>, 533 U.S. 27 (2001) ("At the 'very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting <u>Silverman v.</u>

---

[3] The government has not contested Defendant's standing to challenge the search of his daughter's home.  In any event, defendant's standing in this case is clear. Defendant had been staying with his daughter for several weeks. Supp. Hr'g Tr.  An individual's reasonable expectation of privacy in a home in which he is an overnight guest is well-established.  <u>See</u>, <u>e.g.</u>, <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990) ("[Defendant's] status as an overnight guest is alone sufficient to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.").

<u>United States</u>, 365 U.S. 505, 511 (1961))).  A warrantless police search of a home is therefore "presumptively unreasonable unless it falls with the compass of one of a few well-delineated exceptions."  <u>U.S. v. Romain</u>, 393 F.3d 63, 68 (1st Cir. 2004), <u>cert. denied,</u> 2005 U.S. LEXIS 4793.  Because warrantless searches are disfavored, the government bears the burden of proving the application of the exception.  <u>United States v. Samboy</u>, 433 F.3d 154, 158 (1st Cir. 2005) (citing <u>United States v. Baldacchino</u>, 762 F.2d 170, 176 (1st Cir. 1985)).  They cannot meet that burden here.

### 1.   <u>Exigent Circumstances</u>

The government argues that police discovered the shotgun in the course of a legitimate search of the premises, justified by "exigent circumstances."[4]  The First Circuit has pointed to four situations that would qualify as exigent, not one of which is applicable here: "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself."  <u>Hegarty v. Somerset County</u>, 53 F.3d 1367, 1374 (1st Cir. 1995); <u>U.S. v. Wihbey</u>, 75 F.3d 761, 766 (1st

---

[4] The facts of this case clearly did not justify a protective sweep, and the government concedes this point.  The government therefore does not attempt to justify the search under the protective sweep doctrine.  <u>See</u> Gov. Opp'n at 14, n.4.

1996).  Exigency must be assessed based on the totality of the circumstances.  Id.

The circumstances of this case do not come close to the First Circuit's requirement of "compelling necessity for immediate action that would not brook the delay of obtaining a warrant."  Hegarty v. Somerset County, 53 F.3d at 1374; see also U.S. v. Pihlblad, 1998 WL 165150, 3 (6th Cir. 1998) (finding no exigent circumstances where police entered a home after the suspect had been secured outside (citing U.S. v. Rohrig, 98 F.3d 1506, 1515-16 (6th Cir. 1996))).  Here, the officers had no information suggesting that anyone was inside the house after Matthews left.  Indeed, the government concedes as much, noting "the police did not have reason to believe that there was anyone else in the house after the defendant emerged."  Gov. Opp'n at 14 n. 4.

Rather, the government argues that the police believed, based on information from Ms. Matthews, that  Matthews was a "former Navy SEAL and a violent man" who would "not give up without a fight."  Gov. Opp'n at 3.  That information could hardly justify the search, however, because by the time it occurred, Matthews was already outside the house and fully under police control.  With Matthews securely in police custody and his daughter at the police station, there was no imminent danger.

Nonetheless, police did not bother to discuss the possibility of securing a warrant that afternoon.  Supp. Hr'g Tr.

Still, the government insists, based on Ms. Matthews' comments, that there was danger of muriatic acid or of a booby-trap in the apartment and that therefore it would have been unreasonable for the officers not to enter.  Supp. Hr'g Tr.  To be sure, Ms. Matthews suggested that her father would resist if the police came after him, throwing muriatic acid at them, but in fact, he did not.  He surrendered peacefully.  She said nothing about "booby-traps."  That was sheer speculation on the officers' part.

In short, after police had been waiting five hours outside the home, there was no emergency, no "exigent circumstance" justifying a warrantless search of a private home.  There was no evidence of danger in or near the home.  If *these* are exigent circumstances, the Constitution's warrant requirement will lose all meaning.

### 2.   Consent

The government contends that even if there were not exigent circumstances, Ms. Matthews' consent after the fact of the search somehow legitimizes it.  The government bears the burden of demonstrating that consent was validly obtained.  United States v. Romain, 393 F.3d at 69; Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  This requires that "an appropriate person

voluntarily gave a valid consent."  United States v. Romain, 393 F.3d at 69.

The government must first show that the consent was knowing and voluntary.  See Schneckloth v. Bustamonte, 412 U.S. 222 (1973); Brown v. Illinois, 422 U.S. 590 (1975) (noting that "voluntariness . . . is a threshold requirement").  Whether consent was voluntary depends upon the totality of the circumstances.  United States v. Goodrich, 183 F. Supp. 2d 135, 145 (D. Mass. 2001); United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993); Schneckloth v. Bustamonte, 412 U.S. at 227.  In addition, where, as here, an illegal search precedes the consent, the government must establish that the consent was sufficiently attenuated from the illegal search to purge the taint of the prior illegality.  See, e.g., United States v. Goodrich, 183 F. Supp. 2d at 145; United States v. Pena, 924 F. Supp. 1239, 1250 (D. Mass. 1996).  I will address each of these requirements in turn.

### a.  Voluntariness

Police obtained Ms. Matthews' consent twice, but both consents were given after she was told that her house had been illegally searched and the fruits of that search had been disclosed to her.[5]  As this Court has previously noted, "if the

_____

[5] During the suppression hearing, officers testified that they did not recall the precise timing of the first consent.  The second consent was not secured until 2:39 p.m., after the SWAT team had entered and searched the

consent form was executed after the search had ended, it hardly
provided a lawful justification for the search." United States v.
Tibbs, 49 F. Supp. 2d 47, 53-54 (D. Mass. 1999); see also
Holloway v. Wolff, 482 F.2d 110 (8th Cir. 1973) (finding consent
involuntary where "coercive factors" were in effect because the
individual was aware of evidence of a prior, illegal search);
United States v. Chambers, 395 F.3d 563, 570 (6th Cir. 2005)
(finding consent involuntary where it occurred after police
conducted an illegal search, defendant had been told of the
contraband found, and defendant was not free to leave because,
under these circumstances, "it would be reasonable for [the
defendant] to think that refusing consent would be a futile
gesture amounting to no more than 'closing the barn door after
the horse is out'"); see also W. LaFave, Search and Seizure: A
Treatise on the Fourth Amendment, § 8.2 (4th ed. 2004).

   The policies behind the exclusionary rule, to deter
unconstitutional police conduct and to provide incentives to
professionalize police behavior, would be completely defeated if
courts allowed *post hoc* consent to validate prior, illegal
searches.  As the court noted in United States v. Goodrich:

> To permit the police to avoid application of
> the exclusionary rule by obtaining consent
> after the preliminaries of the search have
> essentially been completed and the most
> suspicious item identified does severe damage

---

house, and the shotgun had been found.  Supp. Hr'g Tr.

> to the goal of deterring unconstitutional
> searches and seizures.

183 F. Supp. 2d at 148.

Under the circumstances of this case, there is no reason to believe that Ms. Matthews' consent was anything other than a submission to a claim of authority, which is insufficient to establish voluntary consent.  See Kaupp v. Texas, 538 U.S. 626, 631 (2003) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion)); see also United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000) (noting that voluntariness requires "more than mere acquiescence in the face of an unfounded claim of present lawful authority" (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968))).

The facts do not support the government's contention that Ms. Matthews' consent was voluntary.  Her testimony before the grand jury was equivocal.  She said that she did not feel coerced but did feel forced.  This does not weigh strongly in either direction in the totality of the circumstances analysis.

To be sure, Ms. Matthews had cooperated with the police prior to her consent, providing information about her father and voluntarily going to the police station.  It may be that Ms. Matthews would have voluntarily consented to the search, had the police requested her cooperation beforehand, but they did not. The government has the burden here, and it cannot meet it by speculation about what she would have done had the police behaved

-14-

properly.  The logic would be: because she voluntarily spoke to
the police and went freely to the police station, she must have
also intended to waive her constitutional right to privacy in her
home.  Consent to waive the Fourth Amendment's protection is too
significant a step to be so lightly inferred.

Ms. Matthews' consent here is distinguishable from cases in
which individuals consented after the police had told them that
they would obtain a search warrant if consent was not given.
See, e.g., United States v. Ngai Man Lee, 317 F.3d. 26 (1st Cir.
2003), cert. denied 538 U.S. 1048 (2003).  In Ngai Man Lee, the
court found that if police could legitimately have obtained a
warrant, then consent to search was not invalid merely because
the police told the defendant that they would obtain a warrant if
consent was not given.  Police could conceivably have obtained a
warrant here had they chosen to pursue one.  Significantly, in
contrast to this case, Ngai Man Lee involved a request for
consent *prior* to the search, and, importantly, that case involved
a car, rather than a home, and therefore required a different
level of Fourth Amendment scrutiny.  Moreover, the police here
conceded that they had no intention of seeking a warrant at all.

Where an individual is aware of the search prior to her
consent, that individual's *post hoc* consent cannot be considered
freely given.  Therefore, Ms. Matthews' after-the-fact consent
cannot justify the prior illegal search of her home.  The

government has not met its burden to show that, under the totality of the circumstances, Ms. Matthews' consent was voluntary.

### b. <u>Taint</u>

Even if this Court found voluntariness, the government must also establish that Ms. Matthews' consent was sufficiently attenuated from the illegal search so as to dissipate the taint of the prior illegality. <u>United States v. Goodrich</u>, 183 F. Supp. 2d at 145 ("When consent follows an illegal act by the police – whether seizure of a person or search of property – the requirement that consent be voluntary is supplemented by a second distinct requirement: that the consent be purged of the taint of the earlier illegal act"); <u>Kaupp v. Texas</u>, 538 U.S. at 632 (finding that to be admissible, a statement must be "an act of free will [sufficient] to purge the primary taint of the unlawful invasion" (quoting <u>Wong Sun v. United States</u>, 371 U.S. 471, 486 (1963))).

To evaluate whether Ms. Matthews' consent vitiated the taint of the illegal search, this Court must consider the temporal proximity of the illegal search to the consent, the presence of intervening circumstances, and the 'purpose and flagrancy' of the official misconduct. <u>United States v. Pena</u>, 924 F. Supp. at 1251

(quoting Brown v. Illinois, 422 U.S. at 604).[6]  Although the exact time of Ms. Matthews' first consent is unclear, she signed both consent forms within an hour or two after the illegal search.  At the time of the first consent, police had just told her of the search of her home.  Immediately before the second consent, police physically brought Ms. Matthews into her recently-searched home and told her about the shotgun a second time.  Thus, no substantial amount of time passed; there were no intervening circumstances to distance her consent from the taint of the search.  The decision to inform Ms. Matthews of the illegal search and the discovery of the shotgun before requesting her consent, combined with the search of the truck on a vague "public safety" rationale and the decision to wait outside the house for five hours without even thinking about obtaining a warrant, suggests the kind of "flagrant" official misconduct identified in Pena.

I conclude that Ms. Matthews' consent was tainted by the prior illegal search and cannot be used as justification for the earlier, warrantless search of her home.

### 3.   Inevitable Discovery

---

[6] In Pena, police conducted an illegal "protective sweep" of the defendant's apartment while he was present.  Minutes later, officers used English and broken Spanish to request Pena's consent to search.  Pena, who spoke rudimentary English, agreed.  The court found that the illegality of the protective sweep, together with Pena's limited English and the close temporal proximity of consent to the illegal search tainted Pena's consent.

Finally, the government claims that the inevitable discovery doctrine saves the search.  They have the burden to prove that the evidence would have been found, absent the constitutional violations.  <u>United States v. Scott</u>, 270 F.3d 30, 42 (1st Cir. 2001) citing <u>Nix v. Williams</u>, 467 U.S. 431, 440-48 (1984).  There are two possible rationales for inevitable discovery in this case: first, that Ms. Matthews' consent was inevitable or, secondly, that the police had probable cause to obtain a warrant to conduct a legal search.  Both arguments fail.

The government contends that because Ms. Matthews consented to the search, not once but twice, the police would have found the shotgun absent any violation of  Matthews' rights.  This argument simply recapitulates the argument described above. After-the-fact consent to an illegal search cannot be considered consent freely given, and cannot vitiate the taint of an illegal search.  Nor can it be used to suggest that Ms. Matthews would have "inevitably" consented, had she not known prior to giving her consent that her home had already been searched and a shotgun had been found.

"Inevitable" discovery cannot mean that a citizen will "inevitably" consent to a search after the police have already conducted it.  If it did, police would have every incentive to search illegally, present the fruits of the search to the citizen, and seek the citizen's inevitable *post hoc* ratification.

Consent, the circumstances surrounding the waiver of important constitutional rights, would become hollow gestures.  As with "exigent circumstances," if situations like this satisfy the "inevitable discovery" requirement, the Fourth Amendment's warrant requirement will lose all meaning.

In the alternative, the government could argue that they inevitably would have found the shotgun through a legal search, after obtaining a warrant.[7]  Even assuming that the police had probable cause and could have obtained a warrant, this argument cannot hold.  If probable cause to obtain a search warrant were sufficient to justify a search under the "inevitable discovery" doctrine even if police never sought one, this too would eviscerate the warrant requirement.[8]  United States v. Silvestri, 787 F.2d 736, 744-45 (1st Cir. 1986) ("[T]he application of the inevitable discovery rule where no warrant is in fact obtained would substitute proof by a preponderance of the evidence that a warrant could and would have been obtained for the requirement of the [F]ourth amendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search.  Such an approach substantially weakens the protection provided by

---

[7] The government does not raise this argument, but in the interest of completeness, I will address the issue here.

[8] This case would have come out differently had police followed proper procedure and obtained a warrant in the five hours they were waiting outside Matthews' home.  See United States v. Silvestri, 787 F.2d 736 (1st Cir. 1986) (holding that a warrant obtained even after an illegal search could justify application of the inevitable discovery doctrine).

the [F]ourth amendment."); <u>United States v. Torres</u>, 274 F. Supp. 2d 146 (D.R.I. 2003).  Police would not bother securing warrants if warrantless searches could be justified by probable cause and the claim that officers *could* have obtained a warrant had they wanted one.

   C.   **Matthews' Statements**

   Matthews argues that the police coerced his statements on December 4, 2004, by threatening to prosecute his daughter.  The defense has not presented sufficient evidence to support the argument that these Mirandized statements were not voluntary.

   The statements must nonetheless be excluded, however, because they were made after the police conducted the illegal search, found the shotgun, and arrested Matthews.  His statements directly responded to these events.  They therefore are not sufficiently an act of free will to be purged from the primary taint as the government suggests.  <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590 (1975); <u>Wong Sun v. U.S.</u>, 371 U.S. 471 (1963).  The statements were the products of an illegal search and, as such, must be excluded as the "fruits" of a poisonous tree.

   As with the issue of consent, the validity of the confession depends on whether it was an act of free will under the totality of the circumstances.  <u>Brown v. Illinois</u>, 422 U.S. at 603.  The temporal proximity of the illegal conduct to the arrest, the presence of intervening circumstances, and the purpose and

-20-

flagrancy of the official misconduct are all relevant to this
analysis.  Id.  In Matthews' case, all of these factors, except
the presence of the Miranda warnings, weigh against finding
voluntariness in this case.  Under the circumstances, his
confession was not sufficiently attenuated from the illegal
search to be an untainted act of free will.  See, e.g., U.S. v.
Torres, 274 F. Supp. 2d 146 (finding statements made at police
headquarters three or four hours after an illegal search of a
home were not sufficiently attenuated from the illegal conduct to
be admissible, even though Defendant had received Miranda
warnings).

In United States v. Paradis, the First Circuit found that
the defendant's statements were sufficiently attenuated from an
illegal search where the statements were made after Miranda
warnings were given and noted: "Miranda warnings are an important
factor in this type of attenuation analysis."  351 F.3d 21, 34
(1st Cir. 2003).  Like Paradis, Matthews received his Miranda
warnings prior to his statements to police.  However, the
similarity ends there.  The police in Paradis had additional
evidence, independent of their illegal search, that minimized the
importance of the illegally-seized evidence.  Id.  In addition,
seven days passed between the illegal search and the questioning

in <u>Paradis.</u>   <u>Id.</u>  Matthews, in contrast, made his statements shortly after the police discovered the shotgun.[9]

The government also argues that the statements fall under the umbrella of the inevitable discovery doctrine.  For the reasons discussed earlier, however, I do not find that doctrine applicable to the discovery of the shotgun in this case, and there is no evidence to suggest that, absent the shotgun, these statements ever would have been elicited.

## IV.  CONCLUSION

There is a right way of conducting searches, and a wrong way.  There is a constitutional way, obtaining a warrant on probable cause, or a lawful consent to search, and an unconstitutional way, searching without either, based on contrived rationale like "public safety," "exigent circumstances," or "protective sweeps."  The Haverhill police chose the latter; the United States' Attorneys' office, by making the case a federal one, effectively legitimized that choice.

I will not.  For the foregoing reasons, defendant Mark Matthews' motion to suppress the fruits, including statements and physical evidence, of a warrantless search conducted on December 4, 2004, (document #8) is **GRANTED.**

---

[9] Matthews signed a Miranda wavier at 3:06 p.m. on the day of the search.

SO ORDERED.


Date: March 1, 2006          /s/NANCY GERTNER, U.S.D.J.